ALDEN F. ABBOTT
General Counsel

JOHN D. JACOBS, CA Bar No. 134154
DELILAH VINZON, CA Bar No. 222681
MARICELA SEGURA, CA Bar No. 225999
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
jjacobs@ftc.gov, dvinzon@ftc.gov,
msegura@ftc.gov
Tel: (310) 824-4300; Fax: (310) 824-4380

KEITH ELLISON
Attorney General State of Minnesota

ADRIENNE L. KAUFMAN, MN Bar No. 0397523
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2134
adrienne.kaufman@ag.state.mn.us
Tel: (651) 757-1485; Fax: (651) 296-7438

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION, and

STATE OF MINNESOTA, by its Attorney General, Keith Ellison,

          Plaintiff,

    vs.

MANHATTAN BEACH VENTURE, LLC, a California limited liability company, also d/b/a The Student Loan

Case No.:   2:19-cv-7849

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

1   Relief Department;                          )
                                                )
2   CHRISTOPHER E. LYELL, an individual;)
                                                )
3   BRADLEY K. HANSEN, an individual;    )
4   and                                        )
                                                )
5   EQUITABLE ACCEPTANCE                       )
6   CORPORATION, a corporation,                )
                                                )
7                                               )
                    Defendants.                 )
8                                               )
9   _____)

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of Minnesota, for their Complaint allege:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1666j, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; or TILA, and its implementing Regulation Z, 12 C.F.R. Part 1026, in connection with marketing, promotion, offering for sale, sale, and extension of credit for the purchase of student loan debt relief services.

2.      The State of Minnesota, by its Attorney General, Keith Ellison, brings this enforcement action under Minnesota Statutes chapter 8, the Minnesota Uniform Deceptive Trade Practices Act ("MN DTPA"), Minn. Stat. §§ 325D.43–.48, the Minnesota Prevention of Consumer Fraud Act ("MN CFA"), Minn. Stat. §§ 325F.68–.694, the Debt Settlement Services Act ("MN DSSA"), Minn. Stat. §§ 332B.02–.14, the Minnesota Regulated Loan Act ("MN RLA"), Minn. Stat. §§ 56.0001–.26, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of the MN DTPA, Minn. Stat. § 325D.44; the MN CFA, Minn. Stat. § 325F.69; the MN DSSA, Minn. Stat. §§ 332B.09, 332B.10; the MN RLA, Minn. Stat. § 56.14; and the TSR, 16 C.F.R. Part 310, in connection with marketing, promotion, offering for sale, sale, and extension of credit for the purchase of student loan debt relief services.

## SUMMARY OF THE CASE

3.     Plaintiffs allege violations of various consumer protection statutes in connection with the sale of student loan debt relief services and the financing of the fees that were charged for those services.  As set forth in Counts I–IX, below, this Complaint alleges law violations on the part of the seller of these services, Manhattan Beach Ventures, LLC ("MBV"), and its owners Christopher E. Lyell and Bradley K. Hansen (collectively with MBV, the "MBV Defendants"), as well as violations on the part of the company that extended credit to pay for MBV's fees, Equitable Acceptance Corporation ("EAC").

4.     The alleged violations by the MBV Defendants, as described in more detail below, include:

      a.   violating the FTC Act, the TSR, the MN DTPA, and the MN CFA by making deceptive representations regarding MBV's services and the payment that consumers were, or were not, required to make;

      b.   violating the TSR by requesting or receiving payment in advance of fully performing the debt relief service;

      c.   violating the MN DSSA by operating as a debt settlement services provider without being registered in Minnesota and by imposing and collecting payment before fully performing all of the agreed-upon services.

5.     The alleged violations by EAC include:

      a.   violating the TSR by assisting and facilitating MBV in MBV's violations of the TSR, while knowing or consciously avoiding knowing that MBV was engaged in such violations;

      b.   violating TILA and Regulation Z by failing to clearly and conspicuously make written disclosures that are required by TILA and Regulation Z;

c.  violating the MN RLA by failing to make the disclosures required by Minnesota Statutes section 56.14(1), which incorporates TILA disclosures into Minnesota state law.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.  This Court has supplemental jurisdiction over the State of Minnesota's claims pursuant to 28 U.S.C. § 1367.

8.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

9.  The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.  The FTC also enforces TILA, 15 U.S.C. § 1601 *et seq.* and its implementing Regulation Z, 12 C.F.R. Part 1026, which establishes, *inter alia*, disclosure and calculation requirements for consumer credit transactions and advertisements.

10.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and TILA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 6102(c), and 1607(c).

11.  Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8, the Minnesota Uniform Deceptive Trade

Practices Act, Minn. Stat. §§ 325D.43–.48; the Minnesota Prevention of Consumer

Fraud Act, Minn. Stat. §§ 325F.68–.694; the Debt Settlement Services Act, Minn.

Stat. §§ 332B.02–.14; the Minnesota Regulated Loan Act, Minn. Stat. §§ 56.0001–

.26; the Telemarketing Act, 15 U.S.C. § 6103(a); and has common law authority,

including *parens patriae* authority, to bring this action on behalf of the State of

Minnesota and its residents to enforce Minnesota law and the TSR and vindicate the

state's sovereign and quasi-sovereign interests, and to secure such equitable relief as

may be appropriate in each case, including rescission or reformation of contracts,

restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

Minn. Stat. §§  8.31, 325D.45, 325F.70, 332B.13, and 15 U.S.C. § 6103.

## DEFENDANTS

12.     Defendant Manhattan Beach Venture, LLC ("MBV"), also doing

business as The Student Loan Relief Department, is a California limited liability

company.  MBV has operated out of 2627 Manhattan Beach Blvd, Ste. 200, Redondo

Beach, CA 90278, 359 Van Ness Way, 2nd Floor, Torrance, CA 90503, and 615

Nash Street, Suite 207, El Segundo, CA 90245.  Starting in early 2016, MBV has

transacted business in this District and throughout the United States, including in

Minnesota.  At all times material to this Complaint, acting alone or in concert with

others, MBV advertised, marketed, promoted, offered for sale, or sold student debt

relief services to consumers throughout the United States, including in Minnesota.

MBV has never registered with the Minnesota Department of Commerce as a "debt

settlement services provider" under Minnesota Statutes chapter 332B.

13.     Defendant Christopher E. Lyell ("Lyell") was, at all times relevant to

this Complaint, a member of Defendant MBV, held himself out as MBV's Chief

Executive Officer and President, and was responsible for marketing and business

development for MBV.  Lyell was a signatory on MBV's depository bank accounts

and entered agreements on MBV's behalf as a "managing member."  Lyell received

consumer complaints against MBV, and was also alerted to consumer complaints that

Defendant EAC received from MBV customers to whom EAC had extended credit to pay for MBV's services.  Lyell participated in MBV's day-to-day business operations.  At all times material to this Complaint, acting alone or in concert with others, Lyell formulated, directed, controlled, had the authority to control, or participated in the acts and practices of MBV, including the acts and practices set forth in this Complaint.  Lyell resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States, including in Minnesota.

14.      Defendant Bradley K. Hansen ("Hansen") was, at all times relevant to this Complaint, a member of Defendant MBV, held himself out as MBV's Chief Financial Officer and Vice President, and was responsible for MBV's payroll, accounts receivable and human resources.  Hansen was a signatory on MBV's depository bank accounts and entered agreements on MBV's behalf as a "manager."  Hansen received consumer complaints against MBV, and was also alerted to consumer complaints that Defendant EAC received from MBV customers to whom EAC had extended credit to pay for MBV's services.  Hansen also responded to consumer complaints received by MBV from state attorneys general.  Hansen participated in MBV's day-to-day business operations.  At all times material to this Complaint, acting alone or in concert with others, Hansen formulated, directed, controlled, had the authority to control, or participated in the acts and practices of MBV, including the acts and practices set forth in this Complaint.  Hansen resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States, including in Minnesota.

15.      Defendant Equitable Acceptance Corporation ("EAC") is a Minnesota corporation whose principal place of business is 1200 Ford Road, Minnetonka, MN, 55305.  EAC transacts or has transacted business in this District and throughout the United States, including in Minnesota.  EAC has been continuously licensed under

Minnesota Statutes chapter 56 since May 24, 2016.  At all times material to this Complaint, acting alone or in concert with others, EAC, pursuant to an agreement with MBV, extended credit to consumers, including Minnesota consumers, to pay for MBV's services.  EAC also received and responded to consumer complaints related to its business with MBV, and responded to inquiries from the Minnesota branch of the Better Business Bureau and from the Bureau of Consumer Financial Protection regarding MBV's deceptive sales tactics.

## COMMERCE

16.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS DECEPTIVE BUSINESS PRACTICES

*Overview*

17.     Throughout at least 2016, MBV Defendants operated a nationwide debt relief telemarketing scam preying on thousands of consumers struggling with student loan debt.  Unless otherwise noted, acts and practices described in this Complaint occurred during 2016.  Unless otherwise noted, all references to "consumers" and "customers" in this Complaint include Minnesota consumers and customers.

18.     During telephone calls with consumers, MBV represented that consumers were qualified under a federal program, for which consumers would enroll through MBV, to receive forgiveness of all or part of their student loan balances, or to receive a permanent reduction of the monthly payments that consumers were required to make on their student loans.  In fact, in most instances, consumers were unlikely to qualify for government loan forgiveness programs and/or MBV could not guarantee a permanent reduction in their monthly payments.

19.     During these same calls, MBV also represented that payment amounts that MBV quoted to consumers would go toward paying the consumer's student loan

balances, when, in fact, all or part of the quoted amounts would go toward paying MBV's $1,300–1,400 fee.

20.     MBV advised consumers to take advantage of these loan forgiveness programs to reduce their student loan debt, and also offered to act and did act as an intermediary between consumers and the federal government and its representatives for the same purpose by, among other things, completing and submitting certain paperwork on consumers' behalf.

21.     MBV engaged in a pattern and practice of deceptive telemarketing resulting in injury to consumers, as described further below.

22.     MBV charged illegal advance fees for its purported debt relief services.

23.     Defendant EAC provided substantial assistance to MBV by extending credit in the form of a high-interest loan to many of MBV's customers to pay for MBV's services.  EAC extended credit to MBV customers who met EAC's criteria for creditworthiness, and EAC collected monthly payments from those customers.

24.     While assisting MBV, EAC knew, or consciously avoided knowing, that MBV was making the deceptive representations described in this Complaint.  EAC also knew, or consciously avoided knowing, that MBV was requesting and receiving fees from its credit customers prior to the time that consumers had received the promised debt relief service and had made at least one payment under a new payment plan.

25.     In extending loans to MBV customers, EAC failed to include essential disclosures in the credit contracts that consumers signed, such as the amount financed, the finance charge (the dollar amount that the credit was going to cost the consumer), and the total of payments (the amount that consumers would have to pay in total for MBV's service combined with the price of the credit).

**Background on Student Loan Repayment and Forgiveness Programs**

26.     Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe approximately $1.5 trillion.  The student loan market shows elevated levels of distress relative to other types of consumer debt.

27.     To address this mounting level of distressed debt, the U.S. Department of Education ("ED") and state government agencies administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs because of strict eligibility requirements.  For example, one program requires the consumer to demonstrate total and permanent disability; another applies to consumers whose school closed while the consumer was still enrolled.  A third program, the Borrower Defense to Repayment ("BDR"), may provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.

28.     Other forgiveness programs require working in certain professions for a period of years.  Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.  Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public sector.

29.     The federal government also offers potential loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments.  IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size each year.  Obtaining forgiveness through IDR programs requires a minimum of 20 to 25 years of qualifying payments.

30.     Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year.  If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

31.     Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third party or the payment of application fees.

32.     ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, unpaid interest adds to the principal balance.

33.     ED also allows consumers with multiple federal loans to consolidate them into one "Direct Consolidation Loan" with a fixed interest rate and a single monthly payment.  ED does not charge for consolidation and offers a dedicated helpline and webpage to assist borrowers with the process.

**MBV's Deceptive Representations Regarding Loan Relief and Forgiveness**

34.     MBV used lead generators, online advertisements, and social media, among other tools, to gather information about consumers struggling to make their monthly student loan payments.  The advertisements touted the availability of payment relief and loan forgiveness programs available from the federal government.  In some instances, consumers entered their contact information on a landing page to receive further information, after which they received a call from MBV.  In other instances, consumers simply called the toll-free number available in the advertisement and were then connected to MBV.

35.     The telemarketing call between MBV and consumers—which was the primary manner by which MBV sold its services to consumers—was lengthy,

typically lasting 30 minutes to over an hour.  Toward the beginning of the call, MBV told consumers that it could provide the exact amount of the new reduced payment and/or loan forgiveness the consumer was eligible to receive under federal law.

36.    During the sales call, MBV quoted consumers a new reduced monthly student loan payment for which the consumer had purportedly qualified, which MBV represented was for the term of the loan.  MBV represented that, upon expiration of that term, the consumer's remaining balance would be forgiven.  In some instances, MBV quoted consumers specific amounts that they would save, usually in the thousands of dollars, by enrolling in the program.  MBV recommended to consumers that they take advantage of the federal student loan debt relief program it had described to them to lower their monthly payment and the total amount of their student loan debt.

37.    MBV also offered to act and actually did act as an intermediary between consumers and ED.  MBV did so, for example, by offering to and actually filling out and submitting certain paperwork on behalf of consumers and by offering to provide follow up information about consumers' income to ED at a later time.

38.    MBV's representations that it was able to procure a permanent reduction in consumers' monthly payments, or that the consumer had qualified for forgiveness, were false or unsubstantiated because none of ED's IDR programs guarantees consumers a fixed, reduced monthly payment for more than a year or guarantees any forgiveness.  Under ED's IDR programs, monthly payments fluctuate based on consumer's income in a given year, which consumers must report annually.  Additionally, whether forgiveness is available at the end of the term, and the amount of any such forgiveness, depends on the total amount that consumers have paid—and the amount that remains unpaid—at the end of the term, which in most instances is 20 to 25 years.  Because MBV cannot predict a consumer's income over a 20-year period, MBV did not have an adequate basis for making any representation concerning the amount of forgiveness a consumer would receive, or the size of the

monthly payment that a consumer would be required to make in any future year.  In many cases, consumers' income will rise over the repayment period, and, as consumers' income rises, so will the monthly payment for the following year.  Any representation of a forgiveness amount based on a consumer's current income is, therefore, likely to be overstated.

### MBV's Misrepresentations Regarding Its Fees

39.     MBV's discussion of fees in its sales pitch was misleading, not only because of direct misrepresentations, but also because MBV's sales pitch in general obfuscated how much consumers would be paying to whom and for what.

40.     MBV in numerous instances misrepresented that the payment amounts that MBV quoted would be going toward consumers' student loans rather than towards paying a fee.

41.     MBV also never advised consumers who signed EAC credit contracts that they would be paying interest on the EAC loan to pay MBV's $1,300–1,400 fee or that the annual percentage rate of that loan was typically between 17% and 22%.  And in some instances MBV led consumers to believe that payment of the MBV's $1,300–1,400 fee was required for acceptance into a new loan repayment program.

42.     One of the ways MBV misled consumers was through its use of terms "program," "entitled," "approval," and "qualify."  MBV used these terms in different ways and at different times to create the impression that MBV was referring to qualification or approval for an ED program or the consumer's new student loan payment when in fact MBV was referring to qualification for a loan from EAC to pay MBV's fee, or to the monthly payment on the EAC loan.

43.     For example, when MBV told consumers the new monthly payment that the consumer was "qualified" for, MBV quoted an amount that included both the monthly estimated student loan payment pursuant to an IDR plan and a payment for MBV's fee.  MBV, however, presented this monthly payment simply as "the payment you qualify for."  For many customers for whom MBV estimated the student loan

1  payment to be zero, the amount of "the payment you qualify for" was solely the

2  monthly payment to EAC for MBV's fee, and did not include any payment toward

3  the student loan.

4  **Electronically Signing Defendants' Contracts**

5       44.    During the sales call, consumers were sent an email with links to

6  Defendants' contracts to sign electronically.  MBV used a script to walk consumers

7  through the electronic signing process.  MBV's scripts prompted its telemarketers to

8  focus consumers on only those portions of the document that the consumer was

9  required to sign electronically.  After a consumer applied her electronic signature in a

10 box, the telemarketer would guide her immediately to the next place in the document

11 with a box for her signature or initials.  MBV directed consumers to click the boxes

12 without any suggestion that the consumer read the contract.  In some instances, MBV

13 assured consumers that the documents merely memorialized what the consumer had

14 been told previously during the call.

15      45.    One of the documents consumers were required to sign electronically

16 was MBV's lengthy form contract (the "MBV Agreement").  As consumers remained

17 on the phone, MBV pressured them to quickly click through and electronically sign

18 or initial multiple pages of the MBV Agreement.  Contrary to assurances by MBV,

19 the MBV Agreement consumers electronically signed did not in fact accurately

20 reflect the representations that MBV made and the impressions that MBV conveyed

21 to consumers during the sales call.  In many instances, the MBV Agreement

22 contradicted or was inconsistent with direct representations made to the consumer

23 during the sales pitch.  For example, according to the MBV Agreement, the service

24 MBV was agreeing to provide consisted of "document preparation services to assist

25 consumers who are applying for federal student loan programs using Department of

26 Education (DOE) forms."  MBV never stated or even implied during its lengthy sales

27 pitch touting loan forgiveness and permanent payment relief that MBV only filled out

28 forms for ED programs.  To the contrary, MBV geared its sales pitch toward

convincing often reluctant and financially struggling consumers that they would obtain permanent debt relief from unaffordable monthly loan payments. The MBV Agreement also imposed an obligation on consumers to pay for MBV's services.

46.     During the same call, if the consumer's credit check prequalified her for the EAC loan to pay MBV's fee, the consumer also received an email with a link to electronically sign EAC's credit contract and other materials (referred to collectively herein as the "Credit Plan" documents). MBV similarly rushed consumers through the electronic signing of the EAC Credit Plan without reviewing the terms in the agreement with consumers, or providing consumers an opportunity to do so themselves. The EAC Credit Plan documents and disclosures are discussed in more detail below.

**MBV Requested and Received Its Fee in Advance of Performance**

47.     During the relevant time period, MBV collected its fee of over $1,300 from its customers in one of two ways: (1) by way of the loan that EAC extended to MBV customers; and (2) directly, through what MBV referred to as "cash" deals. Under both payment methods, MBV imposed, requested, or received payment of its fee in advance of completing its debt relief service and any additional services that MBV agreed to provide.

*Credit Payment Through EAC*

48.     If a consumer met EAC's prequalification criteria for the EAC loan, the consumer received an MBV Agreement requiring payment but stating that payment of MBV's fee would be made by a third party through a separate "Credit Plan" that the consumer (concurrently) executed with the third party (i.e., EAC). The consumer would then receive the EAC Credit Plan documents directly from EAC stating that the agreement "governs all purchases" that the consumer made from the seller, MBV. The Credit Plan documents also provided that, except for a three-day cancellation right, all sales were final.

49.     EAC paid to MBV consumers' fees shortly after EAC received consumers' electronically signed Credit Plan documents and approved the consumer for financing.  As EAC described it, EAC paid to MBV "an agreed amount to satisfy the consumer's obligation to [MBV]."  EAC paid this amount to MBV before MBV completed its debt relief service and any additional services that MBV agreed to provide.

50.     Pursuant to the Credit Plan documents, consumers who were approved for financing by EAC were loaned $1,300 to $1,400 by EAC and were obligated to make monthly installment payments to EAC, which were typically $39 to $49.  While on the sales call with consumers, MBV obtained consumers' bank, debit, or other payment information, which MBV then provided to EAC.

51.     EAC's general policy and practice was to start billing the consumer typically 45 to 75 days after the consumer signed the Credit Plan documents.  Later, EAC changed its practice and started billing the consumer upon hearing from MBV that MBV had submitted the consumer's application for a consolidation or repayment plan to ED on the consumer's behalf, and that ED had approved the application.  EAC did not require any documents to verify that the consumer had actually been enrolled in any consolidation or repayment plan.  EAC's policy and practice was not, therefore, to wait until after the consumer had been approved and had made her first payment under the new repayment program or consolidated loan.  In many instances, EAC sent bills to consumers even when MBV had not submitted the consumer's application to ED or before ED had approved the consumer's application.  EAC's policy and practice was not, therefore, to wait until after MBV fully performed for customers its debt relief services and any additional services that it agreed to provide before paying MBV.

52.     As a general rule, consumers were unable to cancel their obligation to pay MBV before the debt relief services had been completed.  EAC's policy was not to let consumers out of their payment obligation, advising consumers who wanted to

1  cancel that they were outside of the three-day cancellation period, and often directing

2  these consumers back to MBV.  MBV often advised consumers who wanted to cancel

3  that they owed EAC and that MBV could not cancel that obligation.

4      53.   Because EAC was paying the consumer's fee to MBV, EAC knew that

5  MBV was receiving its fee prior to completing the debt relief services for the

6  consumer, as well as any additional services that MBV agreed to provide.  In light of

7  EAC's billing policy, EAC also knew, or consciously avoided knowing, that, when it

8  sent its first loan bill to consumers, it was billing consumers for MBV's fees before

9  the consumer had made at least one payment pursuant to a new payment plan from

10  ED and before MBV had fully performed its debt relief services and any additional

11  services that it agreed to provide.

12                          *Cash Payment*

13      54.   Throughout 2016, MBV also took payment by cash, or cash equivalent,

14  up front from consumers who did not enter into a Credit Plan with EAC.

15      55.   Under this "cash" model, MBV typically imposed upon and charged

16  consumers an initial fee of as much as $499, which MBV required consumers to pay

17  in two to four installments.  MBV required at least some portion of this fee be paid

18  before it started work on the consumer's application, and MBV repeatedly collected

19  this upfront fee.  MBV then collected the remainder of its fee through monthly

20  payments of $39 to $49.

21      56.   MBV obtained from these customers their bank, debit or other payment

22  information during the telemarketing call.

23      57.   MBV claimed that it placed payments it received from these customers

24  into a "special purpose" account and waited to take control of those funds until after

25  it submitted the consumer's IDR paperwork to ED.  However, MBV provided these

26  customers with little or no information about the special purpose account holding the

27  money paid to MBV.  These customers did not own or have control over or access to

28  the funds that were purportedly being held in these accounts.  Consumers were not

1  entitled to return of those funds, even if they terminated the debt relief service prior to

2  performance of MBV's debt relief services.

3  **The Relationship between EAC and MBV**

4      58.    Defendant EAC holds itself out as an "indirect finance company."

5  Throughout 2015, EAC had been working with another Southern California student

6  debt relief company, Progress Advocates Group, LLC (PAG), by extending loans to

7  PAG's customers to pay for PAG's services.  Sometime in 2015, EAC hired PAG's

8  owner, Brad Hunt, to locate and investigate other student debt relief companies that

9  EAC could go into business with.  Hunt was also expected to provide training to these

10  companies regarding sales processes and proper disclosures.

11      59.    In late 2015, Hunt introduced MBV to EAC.  Prior to going into

12  business with MBV, EAC knew or should have known that the sales model MBV

13  would follow was deceptive.  EAC had already received consumer complaints

14  regarding PAG's deceptive sales practices.  Despite these complaints, EAC relied on

15  Hunt as the "industry expert" to vet MBV and to train MBV.  EAC did not conduct

16  an independent review of Hunt's training or MBV's sales practices.

17      60.    At the beginning of 2016, EAC entered into an arrangement with MBV

18  pursuant to which EAC, on a case-by-case basis, would extend credit to MBV

19  customers in the amount of MBV's fee (typically $1,314).  The system worked this

20  way: If, during MBV's sales call, a consumer met EAC's prequalification criteria for

21  creditworthiness, MBV would alert EAC, through an electronic system that the

22  parties put in place, that MBV had a prospective credit customer for EAC.  EAC, by

23  way of its electronic document signing vendor, would then send an email to the

24  consumer with a link to the Credit Plan documents.  After EAC received the

25  electronically signed Credit Plan documents back from a customer, it then made an

26  assessment as to whether to extend credit to the MBV customer.  If EAC issued credit

27  to the consumer, EAC would then pay MBV the amount of that customer's fee

28  (minus a discount reflecting the risk of default by the customer) to satisfy the

1  customer's payment obligation to MBV.  Pursuant to the customer's contract with

2  EAC, the customer would owe the amount of MBV's fee, plus interest, to EAC.

3  EAC made loans to MBV Minnesota customers in this manner after becoming a

4  licensee under the MN RLA on May 24, 2016.

5                **EAC Assistance to MBV's Deceptive Scheme Was Substantial**

6         61.    The assistance that EAC provided to MBV's deceptive telemarketing

7  operation was substantial and allowed MBV to grow over the relevant time period.

8  MBV viewed the EAC partnership as a "golden ticket," because the EAC-loan model

9  provided MBV with "near immediate cash to support operations," without requiring

10  MBV to directly collect fees from its customers.  As an additional benefit to MBV,

11  EAC handled all collections and related issues for payments from consumers who

12  obtained financing from EAC.  MBV has also stated that the EAC-loan model led to

13  "higher client closing conversion rates making the sales and marketing efforts more

14  efficient and profitable."  In addition, shifting consumers' payment obligations to

15  EAC allowed MBV to deflect consumer complaints and cancellation requests by

16  pointing consumers to EAC to seek resolution.

17                           **EAC Ignored Red Flags**

18         62.    After the start of its business relationship with MBV, EAC received

19  consumer complaints about MBV, including complaints they received directly from

20  consumers and complaints that were forwarded from the Better Business Bureau

21  (BBB) and the Bureau of Consumer Financial Protection.  The complaints claimed,

22  among other things, that MBV engaged in misleading sales tactics and that the

23  consumer had not authorized the EAC loan.  The BBB had also received numerous

24  complaints about EAC from MBV customers.  The content and volume of complaints

25  that the BBB received against MBV and EAC became such an issue that, in August

26  2016, the Minnesota BBB contacted EAC and alerted EAC to the high volume of

27  consumer complaints it had received about MBV and the apparent deceptive nature of

28  MBV's sales tactics.  Despite these consumer complaints and the BBB's warning,

1  EAC continued to assist MBV by extending financing to new MBV customers up
2  until the time MBV stopped making direct sales to consumers in early 2017.  EAC
3  has continued to collect monthly payments from MBV consumers who have many
4  months left on their 36- to 48-month loan terms.

5      63.   EAC never reviewed or asked to see the sales scripts that MBV used.
6  Nor did EAC ever listen to or even ask MBV for recordings of MBV's sales calls.
7  Instead, in late 2016, EAC entered into negotiations with MBV to expand their
8  business relationship.

9              **Failure of EAC's Credit Contract to Make Essential Disclosures**

10     64.   EAC's Credit Plan documents typically included pages entitled:  "Credit
11  Request Authorization"; "Equitable Acceptance Revolving Credit Plan"; "Revolving
12  Credit Plan"; "Purchase Agreement"; "Equitable Acceptance Corporation Privacy
13  Policy"; and "Notice of Cancellation."  Over 4,400 MBV customers signed EACs
14  Credit Plan documents, including multiple Minnesota customers who signed EACs
15  Credit Plan documents after May 24, 2016.  These signed agreements created a credit
16  obligation between consumers and EAC.

17     65.   TILA requires that creditors clearly and conspicuously disclose a
18  number of significant terms in closed-end credit transactions, such as the amount
19  financed; the finance charge (the dollar amount that the credit was going to cost the
20  consumer); the number, amounts and timing of payments scheduled to repay the
21  obligation; and the total of payments (the amount that consumers would have to pay
22  for MBV's service combined with the price of the credit).  EAC failed to include
23  these terms in its Credit Plan documents.

24              **EAC Was the Original Creditor under the Credit Plan Documents**

25     66.   The EAC Credit Plan documents were designed to create the appearance
26  that EAC was an assignee, and that MBV was the assignor, of the consumer's credit
27  contract.  Under TILA, assignees of credit contracts are generally subject to less
28  liability than original creditors, limited to only those violations apparent on the face

of the disclosure statement.  However, EAC was not in fact an assignee of any of the Credit Plan documents.  MBV did not sign and was not a party to any of the Credit Plan documents, and, therefore, could not assign, and never did assign, any Credit Plan documents to EAC.

67.     In truth, EAC was the original creditor under the Credit Plan because it regularly extends consumer credit that is subject to a finance charge and is the entity to whom the obligation is initially payable.  It was EAC, through its electronic document signing vendor, that sent the EAC Credit Plan documents to consumers, not MBV; the footer on each page of the Credit Plan documents that consumers received made clear that "The original document is owned by Equitable Acceptance"; and it was EAC, not MBV, that received consumers' electronic signatures on the Credit Plan documents.  EAC admitted that it extended credit to MBV customers, that EAC and these consumers had a direct relationship, and that EAC and these consumers had a separate credit agreement.  MBV has also stated that EAC was the only creditor on the EAC loans.

**The Credit Plan Documents Created a Closed-End Extension of Credit**

68.     Through use of terms such as "Revolving Credit" and other provisions, the Credit Plan documents were also designed to create the appearance of establishing an open-end extension of credit as that term is defined under TILA.  TILA requires different and less numerically-specific disclosures for the extension of open-end credit, in comparison with the requirements for closed-end credit transactions, such as loans.

69.     Despite EAC's efforts to create the appearance of an open-end credit transaction in its Credit Plan documents, EAC's credit transactions with MBV customers were in fact closed-end credit transactions.  Thus, EAC systematically engaged in "spurious open-end credit transactions" because it facially characterized the credit as open-end, when in fact it was closed-end.

70.     Pursuant to the terms of the Credit Plan, the credit was extended for the purchase of a single product, MBV's service.

71.     The Credit Plan also required monthly payments of equal amounts.

72.     EAC did not reasonably contemplate repeat transactions under the purported "revolving" Credit Plan.  No MBV customers have ever made any additional purchases using EAC's Credit Plan.  And MBV itself—the only seller from which consumers were authorized to make purchases under the Credit Plan— did not contemplate that consumers would make future purchases from MBV under the Credit Plan.  Neither MBV nor EAC advertised, marketed, or sold any other goods or services that could be purchased under the Credit Plan.

73.     In its communications with customers, EAC referred to the credit provided under the Credit Plan as "loans."

74.     And the amount of credit that was available to the consumer under the Credit Plan did not automatically and unequivocally replenish as the consumer paid down the balance.

**Consumers' Efforts to Cancel or Obtain a Refund**

75.     A number of consumers have stated that MBV and/or EAC have responded to their cancellation or refund requests with threats to send their accounts to collections, or to report negative information to the credit bureaus.  In numerous instances, MBV and EAC have canceled a consumer's obligation only after that consumer has filed a complaint with law enforcement or consumer protection agencies.  Other consumers have continued to pay EAC out of concern that negative information will be reported on the account to the credit bureaus.

76.     Based on the facts and violations of law alleged in this Complaint, the Plaintiffs have reason to believe that Defendants are violating or are about to violate laws enforced by the Commission and the State of Minnesota because, among other things, Defendants have knowingly engaged in the unlawful acts and practices alleged in this Complaint.  To the extent that Defendants discontinued their unlawful

conduct, they did so only after they were contacted by the State of Minnesota and were informed of the State of Minnesota's investigation.

## THE FTC ACT

77.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

78.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF THE FTC ACT

## COUNT I

## Deceptive Student Loan Debt Relief Representation

### (By Plaintiff FTC against MBV Defendants)

79.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, MBV Defendants have represented, directly or indirectly, expressly or by implication, that:

      a.  consumers had qualified for, or were approved to receive, loan forgiveness or other programs that would permanently lower or eliminate their loan payments or balances; and

      b.  consumers' monthly payments to Defendants would be applied toward consumers' student loans.

80.     In truth and in fact, in numerous instances in which MBV Defendants made the representations set forth in Paragraph 79 of this Complaint, such representations were false or not substantiated at the time MBV Defendants made them.

81.     Therefore, MBV Defendants' representations set forth in Paragraph 79 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

# THE TELEMARKETING SALES RULE

82.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

83.     MBV Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

84.     MBV Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

85.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

  a.  the seller or telemarketer has renegotiated, settled, reduced, or
    otherwise altered the terms of at least one debt pursuant to a

settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

b. the customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

   i. bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

   ii. is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual debt to another.  The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).  16 C.F.R. § 310.3(b).

86. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

   a. The total costs to purchase, receive or use, and the quantity of, any good or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(i); and

b. Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

87.   The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in any act or practice that violates § 310.3(a) or § 310.4.

88.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

89.   MBV Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call.

## VIOLATIONS OF THE TELEMARKETING SALES RULE

## COUNT II

### Advance Fee for Debt Relief Services in Violation of the TSR

### (By Plaintiffs FTC and State of Minnesota against MBV Defendants)

90.   In numerous instances, in connection with the telemarketing of student loan debt relief services, MBV Defendants have requested or received payment of a fee or other consideration for debt relief services before:

a. MBV Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

1            b.   the customer has made at least one payment pursuant to that

2                  settlement agreement, debt management plan, or other valid

3                  contractual agreement between the customer and the creditor.

4       91.    MBV Defendants' acts or practices, as described in Paragraph 90 of this

5 Complaint, are abusive telemarketing acts or practices that violate Section

6 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

7 **COUNT III**

8 **Material Debt Relief Misrepresentations in Violation of the TSR**

9 **(By Plaintiffs FTC and State of Minnesota against MBV Defendants)**

10       92.    In numerous instances, in connection with the telemarketing of student

11 loan debt relief services, Defendants misrepresented, directly or indirectly, expressly

12 or by implication, material aspects of their debt relief services, including, but not

13 limited to that:

14            a.    consumers had qualified for, or were approved to receive, loan

15                 forgiveness or other programs that would permanently lower or

16                 eliminate their loan payments or balances; and

17            b.    consumers' monthly payments to Defendants would be applied

18                 toward consumers' student loans.

19       93.    Defendants' acts and practices, as described in Paragraph 92 of this

20 Complaint, are deceptive telemarketing acts or practices that violate Section

21 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

22 **COUNT IV**

23 **Assisting and Facilitating Deceptive and Abusive**

24 **Telemarketing Acts in Violation of the TSR**

25 **(By Plaintiffs FTC and State of Minnesota against EAC)**

26       94.    In numerous instances, EAC provided substantial assistance or support

27 to MBV Defendants whom EAC knew, or consciously avoided knowing, were

28 engaged in violations of the TSR set forth in Counts II-III of this Complaint.

95.     EAC's acts or practices, as described in Paragraph 94 of this Complaint, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## TILA AND REGULATION Z

96.     The purpose of the Truth in Lending Act is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601(a).

97.     Under TILA, 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. § 1026, creditors who extend "closed-end credit," as defined in 12 C.F.R. § 1026.2(a)(10), must comply with the applicable disclosure provisions of TILA and Regulation Z, including but not limited to, Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

98.     "Creditor" means a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no contract.  12 C.F.R. §§ 1026.2 (a)(17).  EAC is a creditor under TILA and Regulation Z because it extends consumer credit subject to a finance charge and the obligation is initially payable to EAC.

99.     "Closed-end credit" means consumer credit other than open-end credit, and "[o]pen-end credit" is defined as "consumer credit extended by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid."  12 C.F.R. §§ 1026.2(a)(10) and

(a)(20).  EAC extends closed-end credit (as opposed to open-end credit) to consumers under TILA and Regulation Z because the loans do not meet the requirements for open-end credit.

100.   Sections 121(a) and (b) and 128 of TILA, 15 U.S.C. §§ 1631(a), (b) and 1638(a) and Sections 1026.17(a) and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17(a) and 1026.18, require creditors of closed-end consumer credit transactions to clearly and conspicuously disclose in writing, among other things, the following about the loan: the identity of the creditor making the disclosures; the amount financed ("using that term and a brief description such as 'the amount of credit provided to you on your behalf'"); the finance charge ("using that term, and a brief description such as 'the dollar amount the credit will cost you'"); the annual percentage rate ("using that term, and a brief description such as 'the cost of your credit as a yearly rate'"); the payment schedule ("the number, amounts and timing of payments scheduled to repay the obligation"); and the total of payments ("using that term, and a descriptive explanation . . . such as 'the total price of your purchase on credit'").  These disclosures must reflect the terms of the legal obligations between the parties. 12 C.F.R. § 1026.17(c).

101.   Pursuant to Section 108(c) of TILA, 15 U.S.C. § 1607(c), every violation of TILA and Regulation Z constitutes a violation of the FTC Act.

## COUNT V

## Violations of TILA and Regulation Z

### (By Plaintiffs FTC against EAC)

102.   In the course of extending credit to consumers who purchase services from MBV Defendants, EAC has violated the requirements of TILA and Regulation Z by failing to clearly and conspicuously disclose in writing the following information so that the consumer can make an informed decision regarding the credit being offered:

      a.  the identity of the creditor making the disclosures;

b.  the amount financed ("using that term and a brief description such as 'the amount of credit provided to you on your behalf'");

c.  the finance charge ("using that term, and a brief description such as 'the dollar amount the credit will cost you'");

d.  the annual percentage rate ("using that term, and a brief description such as 'the cost of your credit as a yearly rate'");

e.  the payment schedule ("the number, amounts and timing of payments scheduled to repay the obligation"); and

f.  the total of payments ("using that term, and a descriptive explanation . . . such as 'the total price of your purchase on credit'").

103.   Therefore, EAC's practices set forth in Paragraph 102 of this Complaint violate Sections 121 and 128 of TILA, 15 U.S.C. §§ 1631 and 1638, and Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

## VIOLATIONS OF MINNESOTA STATE LAW

## COUNT VI

## CONSUMER FRAUD

**(By Plaintiff State of Minnesota against MBV, Lyell, and Hansen)**

104.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

105.   Minnesota Statutes section 325F.69, subdivision 1 reads:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

106.   The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes goods and services.  *See* Minn. Stat. § 325F.68, subd. 2.

107.   MBV has repeatedly violated Minnesota Statues section 325F.69, subdivision 1, by engaging in the deceptive practices described in this Complaint,

1   with the intent that others rely thereon in connection with the sale of its services,

2   including by making false, deceptive, and/or unsubstantiated representations to

3   Minnesota residents regarding, among other things, that:

4                a.   consumers have qualified for, or are approved to receive, loan

5                    forgiveness or other programs that will permanently lower or

6                    eliminate their loan payments or balances; and

7                b.   consumers' monthly payments to Defendants will be applied toward

8                    consumers' student loans.

9   108.   Lyell is individually liable for violating section 325F.69 based on the

10   unlawful conduct described in this Complaint because he had authority to control and

11   participated in MBV's business affairs, had authority to control and acquiesced to the

12   unlawful conduct, and/or personally participated in the unlawful conduct.

13   109.   Hansen is individually liable for violating section 325F.69 based on the

14   unlawful conduct described in this Complaint because he had authority to control and

15   participated in MBV's business affairs, had authority to control and acquiesced to the

16   unlawful conduct, and/or personally participated in the unlawful conduct.

17   110.   Due to the false and deceptive conduct described in this Complaint,

18   Minnesota residents have purchased services from MBV that they otherwise would

19   not have purchased, thereby causing harm to these persons and enriching MBV.

20   111.   MBV Defendants' conduct, practices, and actions described in this

21   Complaint constitute multiple, separate violations of Minnesota Statutes section

22   325F.69.

## COUNT VII

## DECEPTIVE TRADE PRACTICES

**(By Plaintiff State of Minnesota against MBV, Lyell, and Hansen)**

26   112.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

27   113.   Minnesota Statues section 325D.44, subdivision 1 provides, in part that:

28

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> ***
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

114.   MBV has repeatedly violated Minnesota Statues section 325D.44, subdivision 1, by engaging in deceptive conduct that caused a likelihood of confusion or of misunderstanding among consumers in connection with its sales of student loan debt relief services.  Those practices include, but are not limited to, the following false, deceptive, and/or unsubstantiated representations to consumers in connection with the promotion or sale of MBV's services:

  a.   consumers have qualified for, or are approved to receive, loan forgiveness or other programs that will permanently lower or eliminate their loan payments or balances; and

  b.   consumers' monthly payments to Defendants will be applied toward consumers' student loans.

115.   Lyell is individually liable for violating section 325D.44 based on the unlawful conduct described in this Complaint because he had authority to control and participated in MBV's business affairs, had authority to control and acquiesced to the unlawful conduct, and/or personally participated in the unlawful conduct.

116.   Hansen is individually liable for violating section 325D.44 based on the unlawful conduct described in this Complaint because he had authority to control and participated in MBV's business affairs, had authority to control and acquiesced to the unlawful conduct, and/or personally participated in the unlawful conduct.

117.   Due to the false and deceptive conduct described in this Complaint, Minnesota residents purchased MBV services that they otherwise would not have purchased, thereby causing harm to these persons and enriching MBV.

118.   MBV's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

## COUNT VIII

## VIOLATIONS OF THE DEBT SETTLEMENT SERVICES ACT

### (Plaintiff State of Minnesota against MBV)

119.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

120.   Minnesota Statutes section 332B.03 provides, in part, as follows:

it is unlawful for any person, whether or not located in this state, to operate as a debt settlement services provider or provide debt settlement services including, but not limited to, offering, advertising, or executing or causing to be executed any debt settlement services or debt settlement services agreement, except as authorized by law, without first becoming registered as provided in this chapter.

121.   Minnesota Statutes section 332B.09, subdivision 3, provides, in part, as follows:

A debt settlement services provider may not impose or collect any payment pursuant to a debt settlement services agreement before the debt settlement service provider has fully performed all of the following:

(1) the debt settlement services contained in the agreement; and

(2) any additional services the debt settlement services provider has agreed to perform. . . .

122.   Minnesota Statutes section 332B.02, subdivision 10, defines "debt settlement services," in part, as:

offering to provide advice, or offering to act or acting as an intermediary between a debtor and one or more of the debtor's creditors, where the primary purpose of the advice or action is to obtain a settlement for less than the full amount of debt, whether in principal, interest, fees, or other charges, incurred primarily for personal, family, or household purposes including, but not limited to, offering debt negotiation, debt reduction, or debt relief services[.]

123.    Minnesota Statutes section 332B.02, subdivision 11, defines "debt settlement services agreement" as:

> the written contract between the debt settlement services provider and the debtor.

124.    Minnesota Statutes section 332B.02, subdivision 13, defines a "debt settlement services provider," in part, as:

> any person offering or providing debt settlement services to a debtor domiciled in this state, regardless of whether or not a fee is charged for the services and regardless of whether the person maintains a physical presence in the state.   The term includes any person to whom debt settlement services are delegated.

125.    Minnesota Statutes section 332B.13 provides that a violation of the Debt Settlement Services Act is an unfair and deceptive practice under Minnesota Statutes section 8.31, and that the Attorney General may enforce the act under section 8.31.

126.    MBV is a debt settlement services provider because it provided debt settlement services by (a) offering to act and actually acting as an intermediary between Minnesota debtors and the U.S. Department of Education, where the primary purpose was to reduce the amount of their student loan debt, and separately, by (b) offering to provide advice and actually advising Minnesota debtors about their student loan debt where the primary purpose was to reduce the amount of their student loan debt.

127.    As a debt settlement services provider, MBV must adhere to Minnesota's statutes governing debt settlement services, known as the Debt Settlement Services Act, Minnesota Statutes sections 332B.02–.14.

128.    As a debt settlement services provider, MBV has engaged in multiple, separate violations of the Debt Settlement Services Act, including but not limited to the following:

COMPLAINT

   a.  Operating as a debt settlement services provider or a provider debt
       settlement services without first becoming registered with the
       Minnesota Commissioner of Commerce, in violation of Minnesota
       Statutes section 332B.03, including by offering to and actually
       advising Minnesota debtors on how to settle their student loan debt
       for less than the full amount of the debt, and separately, by offering to
       and actually acting as an intermediary between Minnesota debtors
       and their creditor;

   b.  Imposing and/or collecting payment pursuant to debt settlement
       services agreements entered into with Minnesota debtors before fully
       performing all of the debt settlement services contained in the
       agreements and any additional services that MBV agreed to perform,
       in violation of Minnesota Statutes section 332B.09, subdivision 3.

129.   Due to MBV's violations of the Debt Settlement Services Act, Minnesota debtors had unlawful advance payment obligations imposed upon them and also made unlawful advance payments prior to MBV fully performing the debt settlement services and any additional services it had agreed to perform, thereby causing harm to these debtors and enriching MBV.

130.   MBV's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of the Debt Settlement Services Act.

## COUNT IX

## FAILURE TO MAKE REQUIRED LOAN DISCLOSURES

### (Plaintiff State of Minnesota against Defendant EAC)

131.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

132.   Minnesota Statutes section 56.01(a) provides as follows:

Except as authorized by this chapter and without first obtaining a license from the commissioner, no person shall engage in the business of making loans of money, credit, goods, or things in action, in an amount or of a value not exceeding that specified in section 56.131, subdivision

1, and charge, contract for, or receive on the loan a greater rate of interest, discount, or consideration than the lender would be permitted by law to charge if not a licensee under this chapter.

133.   Minnesota Statutes section 56.14(1) provides as follows:

Every licensee shall . . . deliver to the borrower (or if there are two or more borrowers to one of them) at the time any loan is made a statement making the disclosures and furnishing the information required by the federal Truth-in-Lending Act, United States Code, title 15, sections 1601 to 1667e, as amended from time to time, with respect to the contract of loan.  A copy of the loan contract may be delivered in lieu of a statement if it discloses the required information[.]

134.   EAC became licensed under Minnesota Statutes section 56.01(a) in May 2016 and has continuously and without interruption been a licensee under chapter 56 since this time.

135.   EAC made loans to Minnesota borrowers as a licensee under chapter 56. As such, EAC was required to provide to Minnesota borrowers the disclosures required by TILA pursuant to Minnesota Statutes section 56.14(1).

136.   TILA requires creditors of closed-end consumer credit transactions to clearly and conspicuously disclose in writing, among other things, the following about the loan: the identity of the creditor making the disclosures; the "amount financed" (using that term); the "finance charge" (using that term); the "total of payments" (the sum of the amount financed and the finance charge); and the payment schedule (number, amount, and due dates or period of payments scheduled to repay the total of payments).  *See* 15 U.S.C. § 1638.  Accordingly, Minnesota Statutes section 56.14(1) separately requires EAC to disclose this information to its Minnesota borrowers pursuant to the statute's terms.

137.   EAC has repeatedly violated Minnesota Statutes section 56.14(1) by failing to clearly and conspicuously disclose in writing, among other things, the identity of the creditor making the disclosures, the amount financed, the finance charge, the payment schedule, and the total of payments as described in Paragraph 25.

138.   EAC's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 56.14(1).

## CONSUMER INJURY

139.   Consumers throughout the United States, including those in the state of Minnesota, have suffered and will continue to suffer substantial injury as a result of MBV Defendants' violations of the FTC Act, the MN DTPA, the MN CFA, the MN DSSA, and the TSR, and EAC's violations of the TSR, the MN RLA, and TILA.  In addition, MBV Defendants and EAC have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, MBV Defendants and EAC are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

140.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

141.   Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from MBV Defendants' and EAC's violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

142.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Minnesota to enforce its state law claims against Defendants for violations of the MN DTPA, the MN CFA, the MN DSSA, and the MN RLA. Minnesota Statues sections 8.31, 325D.45, 325F.70, and 332B.13 and equity

authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of these statutes, including injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, and Plaintiff State of Minnesota, pursuant to Minnesota Statutes sections 8.31, 325D.45, 325F.70, and 332B.13, and as authorized by the Court's own equitable powers, request that the Court:

A. Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery;

B. Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, TILA and its implementing Regulation Z, the MN DTPA, the MN CFA, the MN DSSA, and the MN RLA by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, TILA and its implementing Regulation Z, the MN DTPA, the MN CFA, the MN DSSA, and the MN RLA, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D. Award Plaintiff FTC the cost of bringing this action; and

1    E.    Award such other and additional relief as the Court may determine to be

2          just and proper.

3

4                                        Respectfully submitted,

5                                        ALDEN F. ABBOTT

6                                        General Counsel

7    DATED: Sept. 10, 2019

8                                        John D. Jacobs

9                                        Delilah Vinzon

                                         Maricela Segura

10                                       Attorneys for Plaintiff

11                                       FEDERAL TRADE COMMISSION

12                                       and

13                                       KEITH ELLISON

14                                       Attorney General

                                         State of Minnesota

15

16   DATED: _____

17                                       Adrienne L. Kaufman

18                                       Assistant Attorney General

19                                       Attorneys for Plaintiff

20                                       STATE OF MINNESOTA

21

22

23

24

25

26

27

28

- 39 -
COMPLAINT

E.    Award such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

DATED: _____

John D. Jacobs
Delilah Vinzon
Maricela Segura
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

and

KEITH ELLISON
Attorney General
State of Minnesota

DATED: 9/10/2019

Adrienne L. Kaufman
Assistant Attorney General

Attorneys for Plaintiff
STATE OF MINNESOTA

- 39 -
COMPLAINT